Okay, we are up to Nelson-Ricks Cheese Company v. Lakeview Cheese Company. Thank you. Thank you, Your Honors. John Avondette, and may it please the Court for the appellant, Nelson-Ricks Cheese Company. The issue of whether a use of a trademark constituted commercial use under the Lanham Act should be reviewed based on the totality of the circumstances of the use. And so what the District Court did in this particular case was it looked specifically at the manner in which Lakeview used my client's mark on only one particular web page that's associated with a larger website, the URL banquetcheese.com. And the District into the overall use of the website in its determination that this was actually not commercial use under the Lanham Act. This was error because this is supposed to be summary judgment, and the Court's supposed to look at the website itself and the substance of the website and give my client the favorable inferences. And if you look at ER-60, which is probably the best image of the about web page, you'll see that the information contained on that particular web page that, again, is linked to the overall website is not just historical in nature, but is instead, constitutes essentially an advertisement for the Lakeview product for the banquet cheese labels that were being sold by Lakeview itself. As a consequence, the information that's contained on the about page, it advertises or actually encourages visitors to the website to contact Banquet, which is the Lakeview company, and find out about the quality of their products, find out about the new products that are being developed. And this was done... All right. What is it that encourages this disconnected web page? Is that what you're talking about? Well, I take issue with the term disconnected web page because it's still connected to the overall website. But yes, yes, the about web page. It's not, I mean, it's not, but it's only reachable. It's not reachable through the website. You have to actually specifically put in a, um, a search, search for that particular page. Yes, Your Honor. Somehow have to know that this about thing with the underline and all that. Right. Yeah. The URL, as of April or May of 2014, the navigational header and footer of the website was changed, was edited by Lakeview to remove that outward facing link. So any visitor to the website could then just click on the link and then access the about web page. However, the about web page was not deactivated from the server, nor was it disconnected from the internet, which would have been the result if it had been taken off of the server. So therefore what I said is correct. In order to reach it, however, you needed to put in a URL specifically for that. Either yes, you could put in the specific URL, the banquetcheese.com slash about, or as Ms. Teamee talks about in her declaration, if you run a Google search for, even for Banquet Cheese or for Nelson Rick's Creamery Company, the fact that that page is there, it's continuing to be indexed by Google and the search engine. They continue to be indexed by Google anyway. Not if it's deleted from, from, from the internet. You wouldn't get a 404 message if, if they deleted it in that sense? If, if, if. I thought the index was sort of perpetual. Well the, certainly the, you know, you could. Because I get them all the time. Yeah, and if, if that particular web page had been deleted, your honor, it would have been, you would have gotten a 404 error. Or there could have been other measures taken to mitigate against the confusion that would have been caused in the search indexing because there are resources available to webmasters in order to mitigate the effects of those. Do you have any, any count of any sort as to how many visits there were or could have been to this? As I read your theming, theme, was, was things could happen, but I didn't see anything that indicated that they ever had or how much they ever had. Right, yeah. Did I miss something? No, you didn't, Judge Boggs. And the reason why is we asked for that in Discovery specifically for web analytic information and Lakeview said, we don't have any. We didn't, they didn't provide any to us in Discovery. And so that, that information is not contained in the record. We don't know how many. Well, but you're, you're, are you saying they were lying, that they really had such information or simply that they, that they made a good faith answer? Did you try to, I mean, are you, are you contesting that, that they should have provided you with something that you know they have? That's not an issue we've raised on appeal, your honor. So we're not, we're not saying one way or another, whether their assertion was true or not. We simply didn't have that information, but what Ms. Teamy does talk about is that by virtue of the web page remaining active, it certainly increased the visibility of Banquet Cheese in any kind of search that would have been performed on the internet and these search results would have come back with, with Banquet being placed higher than it otherwise would have been had the page actually been deactivated or those mitigation steps been taken through, through Google that are available to webmasters. And that's information that is contained in Ms. Teamy's declaration, although admittedly there could be more detail if certain information had been produced in discovery, which we don't have. But in looking at the website overall, it certainly tends to look and appear to be a commercial website because it is advertising certain products. And the products that are listed on the Banquet Cheese website itself, the Monterey Jack cheese wheels are also the same products, the exact same products that we learned about in June of 2018 were being advertised on the Lakeviewcheese.com website, and this was after we had all argued summary judgment and briefed it, but we found this particular pack size sheet that's also contained in the record. And that, these individual packages of cheese, so these individual bricks contain the Nelson Ricks Creamery Company mark right on the labels. And so for, I have a difficulty squaring on summary judgment how the district court's that the use of the mark on those pack size sheets doesn't constitute commercial use, because it seems that would be almost traditional. Well, for one thing, it's almost impossible to see them. Well, I agree. I mean, to use something that, I mean, use has some notion that you're wanting people to see it. If no one's going to actually see it, it doesn't seem like you're using it. Well, I do think that it is visible. That's not a question of in commerce, it's a question of using it. Right. But I do think that the use of that particular, that particular phrase, the trademark phrase, is visible on the labels. I do think that if you pull it up on a computer, and I recognize that when printing things out. And you blow it up and you have eagle eyes. Right. Or if you go to the supermarket. But that suggests that, that you still have, the person putting it there has to be using it, meaning expecting people to see it. And if you really wanted people to see it, you wouldn't do it that way, would you? Well, I don't know. I mean, certainly what, one of the interests that Mr. Gaglio, who was the president of the banquet label, that was one of the things that interested him in engaging in the transaction in 2012. And as a consequence, he started using those labels for a period of time, starting shortly after they had gotten the factory in Salt Lake City ramped up. And he was selling under those specific labels. There was a limited license up until 2014. But what the information contained on the Lakeview Cheese website indicates is that this advertisement of these bricks of cheese that you or I could purchase in the grocery stores in southeastern Idaho, or even in Utah, or throughout the country, I believe, would actually, you could pick them up and you could see that it would say Nelson Ricks Creamery Company, founded in 1907 with the backs of two spring wagons. I mean, so all of that information is there on those individual labels. And so the use of those, of the trademark in commerce, I think, is almost conclusively established based upon the PAC size sheet, now, at least from our perspective. Now, the other issue that the district court relied upon was finding that there was not a likelihood of confusion. And this, of course, is a critical test under any Lanham Act claim, is whether there's a likelihood of confusion. But I want to draw the court's attention to the district court's decision, and there's a footnote. It's footnote two. And it's in that footnote that the district court admits to weighing the evidence under Sleetcraft. And this court has routinely counseled district courts not to engage in weighing of evidence on summary judgment. Okay. So we can just not weigh the evidence. Right. All right. So if we don't weigh the evidence, what's the evidence of confusion? So the evidence of confusion is that it was undisputed that four of the eight Sleetcraft factors went in my client's favor. Three of those factors were not even really disputed by Lakeview. And those three were the internet troika that this court has recognized have greater prominence in the consideration of whether there has been a likelihood of confusion established by a plaintiff. And those three are, of course, the similarity of the marks, the proximity of the goods, and the use of the internet as a marketing channel. Lakeview didn't dispute any of those three. And so, Your Honor, in Reardon, LLC, which I know is your case, Judge Bergeson, the court commented— I didn't. Go ahead. Well, I know you were at least part of the panel. The court in that case commented that when there's evidence of these factors that is a pliable test and that some of these factors go in favor of a claimant, of a plaintiff like Nelson Ricks, then it's up to the jury to make the ultimate determination of whether there has been a likelihood of confusion and therefore an infringement. It's not up to the district court on summary judgment to make that kind of a ruling. The district court is supposed to just say, look, given these fact-intensive inquiries, we have to allow the jury to make that ultimate determination. And the district court then went on and looked at three additional factors and said that they weighed heavily in favor of Lakeview. However, those three factors—intent to misuse the mark, actual confusion, and the sophistication of the customers—are actually not all that important. Because this court in Goto.com v. Disney expressly said as to the issue of intent that even if Disney had acted and was as innocent as a fawn, that it would not prove anything as to whether there had been a likelihood of confusion. Moreover, on the actual confusion issue and that particular element under Sleekcraft, if my client had evidence of actual confusion, then that would be something that would tend to show the likelihood of confusion, but the absence of such evidence does not work the other way. The converse proposition— It doesn't work at all? No. I don't think it does. So a single instance of confusion, that's some evidence of little likelihood? Right. The court in Brookfield expressly said that it's not noteworthy that there is no showing of actual confusion, that it's not a noteworthy finding. The problem that we have is at least in that context where there's no actual confusion, we have some evidence of probable confusion like these surveys where people go and show it to people and say, are you confused? But we don't have that. We have no evidence either as to actual or probable confusion. Well, I disagree because Laura Teamee testified that based upon the use of the website and how Google runs its, how it indexes these websites, that confusion likely occurred. And that's on page, I believe it's 135 of the record. But she couldn't say that the reason that, and this is why the district judge discounted her, didn't put a lot of weight on her evidence, she couldn't show that it was showing up for that reason. Right. But again, this is more probable than not, and that's the standard in a civil case. And so the jury could easily listen to Ms. Teamee's testimony that confusion likely didn't have any evidence, as I understand it, as to why the, this was still showing up on Google. Well, she couldn't say a hundred percent that this was the sole cause, but that's not something much fuzzier than that. I really can't say. Well, I think Ms. Teamee testified in her declaration that it was because that certainly that the role that the about page had in bumping up the visibility of Lakeview's website was, it did in fact play a role, and that confusion likely did in fact occur. And so . . . I'm sorry. Just to understand that point, did she say that because this site existed, even if nobody ever visited that site, it would have caused people to visit other sites related with defendants? No, Your Honor. She didn't say that. No, no, no. Instead, what she did say is that how this particular website is indexed, it would increase the visibility of Banquet Cheese when someone were to run a search for our mark, for my client's mark. And as a result, it would be more prominently displayed, and people could then affiliate Banquet Cheese with Nelson Rick's Creamery Company. Which set of customers are you speaking of? Because I thought we would focus on the wholesale market as opposed to the retail market. Yeah. So, that was one of the issues that Judge Knight actually focused on, was that both companies, Nelson Rick's and Lakeview, sell to wholesalers. But the Banquet label, the way the Banquet label itself is actually sold in grocery stores, and that's what the pack size sheet actually indicates. And so, what I understood the jurisprudence to be is that when you're looking at the relative sophistication of the customers, you look at the least sophisticated customer. And whereas, wholesalers may be more sophisticated than you or I when we go to pick out a block of cheese. But those are the folks who are making the purchasing decision based on use of the mark, right? I don't think there was any evidence that folks who are showing up in the grocery store are going to be confused as to ... That's what I thought the ... And I think that's right, Judge Wofford. I think we don't have evidence that the people in the grocery store ... However, I would say that the use of those labels that are indicated in the pack size sheet, which would be the labels that we would see in the grocery store, does use our mark. But the back pack ... I mean, you're saying that those labels were in the grocery store at that time? No, I don't know, Your Honor. You don't know? So the only evidence is that they were on, you know, way very hard to read, a pack sheet that was directed at wholesalers. Well, they were published on the website. That's correct. They were on there. But the particular document, as I understand it, was a document that was sort of an offer of certain products for certain prices to wholesalers. Yeah, I think that's true, but I think the evidence itself ... I mean, that's what you would actually see in the grocery stores were those kind of bricks of cheese. So you're saying that even though there's no evidence of those ... You're suggesting that because they were on the website that way, they were also in grocery stores that way? I'm saying I don't know. All I know is that they were advertising ... No, right. We have no knowledge. There's no evidence that there was ever anything in a grocery store in the relevant time period that had those labels. Other than the fact that they were actively advertising ... That those were publicly represented as being the labels for the products that were offered. Most likely, they were just left over. I mean, the pictures were left over. And Your Honor, even if they were left over, the innocence or perhaps the neglect in terms of leaving that on the website has no bearing on whether this is actually causing a likelihood of confusion. Well, but it has a bearing on whether there's any likelihood that they were actually in stores that way. That may be true, but ultimately, in terms of the determination of a likelihood of confusion, that's still a jury question. But isn't part of the ... I mean, we're talking about this as though it was an internet kind of thing, and you do mention that, but from a realistic point of view, how much different would it be than having some leftover brochures that might in fact be in a grocery store up in Nampa or Stanley, Idaho, and no place else? Would that still create the same likelihood of confusion? That is, since we have no evidence as to how many people ever went to this site, how different would it be from having some leftover brochures that you didn't pull off the shelves at some general store? With respect to the pack size sheets, Judge Boggs, the use of those sheets occurred well after Lakeview was made aware of our mark. Can one read the mark on the website without some enhancement? I think if you print it off in color, yes, you can. I printed it off in color and I could read it. Why would you print it? I think it is possible without enhancing it, I do. I recognize the copies are not the greatest. On the website. Yes, you are. But I have one last question with regard to Ms. Thiem. The district court says that she said that she didn't have, when asked if she was possible to segregate the impact of Lakeview's actions from prior internet use and association between Creamery and Banquet, she said she did not have the ability to do that. Is that accurate? I think that is right, Your Honor. Well, there you go. I mean, there is no, she didn't say it is not 100 percent, she said I have no ability to tell you that. Well, she had no ability to disarticulate that from any other factors. What she was able to do is affirmatively testify that because the About page remained active and based upon how Google does its indexing, that that would in fact increase the visibility as a result of the search terms. So there is a role that it does play. And so I agree, she can't disarticulate it from any other factors, but from the other factors, but she can testify affirmatively that it did in fact play a role in boosting the visibility. Okay, thank you. Thank you very much. Thank you.  Thank you very much. Good morning, Your Honors. Eric Cohn on behalf of Respondent Lakeview Cheese. This is really an exceptional case. It presents a unique situation where post-sale inadvertent and unknown use has been brought as a trademark claim. I want to clarify a couple of questions from Your Honors. One, with regard to the Count page and how many times these pages were visited, there was no evidence, simply because our client had not triggered that as part of their web page. It's something if you want to count visitors, you have to actively trigger that. That information was not available. But I want to talk and just clarify some information about the two incidents at issue here. First is the About Us page. The About Us page, our client inherited the web page in 2012 when we bought the Banquet brand and the cheese company factory in Salt Lake City. We had a limited license to use that mark for a period until it was terminated in 2014. The reason we had that right was because as part of the packaging purchase of the factory, we purchased thousands and thousands of Banquet cheese packages that already had a commentary about Nelson Rick's Creamery company on those packages. And so we were able to use that name and to use those packages until that limited license was revoked. And it was revoked in 2014, about the time when the packaging expired and when the sale of Nelson Rick's Creamery occurred to the appellants. At that point in time, we stopped using the packaging and the About page was disconnected. And from our perspective, our clients thought they had taken it out of use in commerce because they had disconnected from the web page. If you've looked at the website, it's only a couple pages. Our clients process cheese. They're not Yahoo. They're not Google. They're not Amazon. They're not internet specialists. They thought they had, and the evidence from Mr. Gagula indicated he thought that page was gone. As soon as they were notified two years later, as soon as they were notified that that page was still accessible, they immediately went through and deleted all the references to Nelson Rick's. I would say, Your Honors, that this would be applicable to if the factory in Salt Lake City had the Banquet Cheese sign there at the address and there was a plaque that talked about how these companies had been formed in 1907 and the history of Nelson Rick's and Banquet Cheese. And then when the license to use Nelson Rick's was gone, they had scraped that plaque off the wall. They'd thrown it in the yard or in their storage yard, and they thought it was out of commerce. And then a few years later, Nelson Rick's comes and says, Hey, we saw that plaque in your storage yard. You need to stop using that. And then we destroyed it, and then they sued us. With regard to the PAC label photographs, Lakeview Cheese, again, on their new website for their primary company, did list those, and you've seen that in the record. Those photographs were photographs of the Banquet Cheese packaging that they had inherited in 2012 during the time frame which they had the license to use that. As soon as we were notified that those pictures had that mark on there, we took that page down. And now, Your Honor, you do get a 404 error if you go to look for those PAC size sheets on Lakeview's site. As to their visibility, I will tell you that in order for me to see those, I had to pull them up on my 24-inch high-definition computer screen in order to read those. I don't think, you know, from a legal perspective or a factual perspective, that that constitutes use in commerce or with relationship to a sale. I know Your Honors have read the briefing. The Lanham Act requires that all four requirements be met in order for a finding of trademark abuse to have occurred. In this case, the primary consideration is confusion, and I'd refer the Court to the multi-time machine case from this circuit where they have noted that the core element of trademark infringement is whether the defendant's conduct is likely to confuse customers about the source of the products. In the multi-time machine case, the Court did note that likelihood of confusion can be found and determined on summary judgment. The Court said that if the trademark holder is unlikely, or if the Court is able to view the evidence and determine that it's highly unlikely that trademark confusion would occur, then summary judgment is appropriate in those cases. So are you, I gather that from the way you're arguing this, that you think the sleek factor slash likelihood of confusion approach to this is more favorable to you than the use in commerce. I think they're equally favorable to us, Your Honor. What the district court said about use in commerce, which is that this was strictly historical information, isn't quite right. I think the district court may have been confused in its analysis between whether it was talking about the entirety of the website or the disconnected about us page. No, the disconnected about us page. But even the disconnected about us page is largely in the present tense, and it's not strictly historical. Your Honor is correct. The about us page, as it existed in 2016 when we received the cease and desist notice, was the exact same about page that Nelson Rick's company had created whenever it historically created that about page. That about page had not been changed since our company had inherited that webpage. And in fact, if you look at the page, it makes reference to the historical Nelson Rick's If you look at the reference to the ownership, it refers to the past ownership that had expired several years ago. Today, Nelson Rick's Creamery Company produces a large variety of products, has two facilities, and it continues to grow through research and so on. So it's definitely not strictly historical. It's not historical. It is talking in present tense, absolutely. But that webpage, it's historical in the sense that Lakeview Cheese did not modify that page as it shows in the contested form. I didn't understand that that's what he meant. That was created by Nelson Rick's and never changed by us until we were told that it was still available on the Internet. And then we changed it to Lakeview instead of Nelson Rick's. So use in commerce, I think it favors us. The Court may disagree. Certainly, the sleek view factors, and again, this Court, the Ninth Circuit, has held that sleek view is not a hard and rigid set of standards or checklists that you need to go through. Rather, it's a guidance that needs to be applied case by case. In this situation, we believe that in order for confusion to be found, and the Ninth Circuit has held that it's not just confusion as possible. It has to be plausible, and it has to be an appreciable number of people who would be confused by this. And in this instance, both with the About page, you would have to have an appreciable number of people who actually find the About page and then are confused by the About page. Now, this is a very small industry. Most virtually all of the sales are done through wholesalers. These are not cheese products that you would generally find in the grocery store. They're cheese products. If you went to a restaurant and ordered some food and it had cheese on it, you might get some Nelson Rick's or some Lakeview cheese, but you wouldn't know whose cheese you were ordering. This is not— They're sold retail, though, isn't it? It is not generally sold retail. They are generally selling to wholesalers who sell to restaurateurs or sell to other people who repackage cheese. It's not a product that you're generally going to find in your grocery store. So the wholesalers who buy it would have had to find the website, be confused by the website, and not realize that—and again, it's a small industry—not realize that, hey, instead of me thinking that in 2016, Banquet Cheese is still affiliated with Nelson Rick's, the most likely outcome would be that they think, hey, Greg Gaglio has failed to update his website since he bought Banquet Cheese. That's the more likely scenario than being confused about who owns which company. As far as the pack sheet sizes, you'd have to actually click on the pack size sheet PDF, scroll through there, blow up the picture, and notice that on the packaging of the Banquet Cheese labels, there's a reference to Nelson Rick's, and then be confused that they were still affiliated rather than realizing that the company had been sold four years previously. So we think, again, we think it's not used in commerce. There's confusion. It's appropriate to find that on summary judgment. As far as the initial interest conversion test and Ms. Times' discussion, I think it's important— It's not used in commerce because it wasn't used, it wasn't commerce, or because it wasn't one of the list of particular uses that's in the statute? Tell me why it's not used in commerce, specifically. Your Honor, we didn't say it's not used in commerce because once it was disconnected from the website, our clients had intended to take that page out of use in commerce. So they weren't using it? Is that what your point? It was dormant. They had intended when they disconnected that from the website that that page no longer be accessible. Again, I would say it's similar to a plaque on a building. I understand that the internet is a new world compared to the physical world, and the law may still be catching up with that. But the obligation—and it's a new area, and it is not detailed in any cases in this circuit or otherwise, this particular issue. But the burden that the court would be putting on purchasers of longstanding companies if it said that, as appellants have requested, that once you buy a company, you're required to affirmatively go onto the internet and find everything you can scrub about the past history of that company. And our client had bought a company— But I'm still trying to understand with—I mean, a generic answer to this might be more satisfying than the particular one going through the sleek craft factors, which are not terribly satisfying anyway. But the statute says, use in commerce a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services. This is said to be advertising, so it doesn't matter. You said at one point in your briefs, well, it has to be on the actual product, but that's not true with regard to this statute. I think that you're correct, Your Honor. It does not have to be on the product. All right. And the defendant's are probably—I mean, the plaintiffs are probably right about in commerce is really a reference to the Commerce Clause, so to speak. So, therefore, what, therefore they didn't use it because they meant to get rid of it, or they weren't— Well, Your Honor, what I think, and I think there's some confusion in the case, or some overlap between the use of in commerce or use in connection with the sale of goods. Okay. But it doesn't have to be in connection with the sale of goods. It can be in connection with advertising goods. Correct. And I think the webpage, the BanquetCheese.com webpage as a whole was their—they don't do internet sales, so it wasn't necessarily to line up sales, but it was their advertising of products. Without question, their products were advertised on the BanquetCheese.com website. Our position would be that with regard to the page as a whole, or the website as a whole, but then to the unique about us page, when Lakeview Cheese attempted to disconnect that about page from the webpage, the webpages as a whole, they were attempting to remove that from commerce or from the connection in the sale or advertisement of goods. That's what they were attempting to do. If you went to BanquetCheese.com, they were clearly there trying to advertise their products. Are there any cases that you can point us to about inadvertent use, essentially? There are not cases that we can point you to on this subject. Not only in the internet context, but in any context, in terms of somebody who says, we're trying not to use this, but they didn't do it right. We scoured the internet, and we pointed in our briefing to the only two cases that we could find. They are not perfect cases for this situation. It is a unique situation. Those cases were the 20th Century versus Fox case and the Scholastic case, where they talked about where Fox had purchased the rights to use X-Men, and 20th Century Fox still had some X-Men-related websites that they had registered. The court had said that that dormant website use was not trademark infringement. In that case, I believe that there were some X-Men-related links that 20th Century Fox had. If you clicked on them, it might have taken you back to the 20th Century Fox homepage. They said those dormant sites were not trademark violations, but there's not a perfect situation there. I want to ask your colleague, is this any different than something physical? You have the same sort of purchase of something. You have some legacy brochures that have been in dentist offices or whatever, and you say, okay, let's recall all of them. Let's pull them all away. It turns out that you didn't have all the right dentists, so you still had these legacy brochures somewhere. Is there any reason to treat the one any different than the other, just because the Internet is involved? No, Judge Box, and I think you're spot on there. You can do the best that you can to claw back what's available or readily available, but it's not a perfect world. The plaintiffs or appellants have said that we should have gone out and affirmatively found every business directory on the Internet and corrected their mistaken information from the 105 previous years where Banquette Cheese and Nelson-Ricks were affiliated together. I believe that the case law supports finding that unless you affirmatively go out and do something to use that mark, you can't go clean up the world where there's ... Is there some intent or positivity? Affirmative act, if you're using it. If you have purchased the company and they have 100 years of material in the world, you're not using that material simply because it still exists, but if you then went out and affirmatively made use of that mark going forward, that would be a trademark violation. But the fact that historical information exists out there that you haven't cleaned up, that itself is not a use or a violation. Okay, thank you very much. Thank you, Your Honor. Thank you for your argument. We'll give you one minute. Lakeview did, in fact, make a change to the About Us webpage in approximately 2014. If you look at ER-60, that particular iteration of the webpage shows an online store and in approximately May, April of 2014, that online store was edited out by Lakeview. And so, as it appeared from 2014 until 2016 when the cease and desist letter was sent, the substance of ER-60 was there with the- Doesn't that prove even more that it wasn't trying to use it to advertise anything? No, Your Honor. I don't think it does. And regardless, I don't think that the intent is even really that important of a factor still under the sleep craft. Doesn't use have some notion of intentionality? Well, yes, and I think there is at least a latent notion of intentionality, and certainly Lakeview, when it acquired the Banquet Cheese website in 2012, intended to use the website to advertise its products, and that's what my colleague, Mr. Hone, acknowledged in his presentation to you, that they did, in fact, want to use it, but by virtue of that, they have to own the entire substance of the website itself. Thank you. Thank you very much. Okay, the case of Nelson Rick's Cheese Company versus Lakeview Cheese Company is submitted, and we'll go to the last case of the day, Henneman versus Kitsap County.
judges: Boggs, Berzon, Watford